**EFiled: Jun 04 2018 08:00AM EDT**
**Transaction ID 62089694**
**Case No. 12220-VCL**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GLIDEPATH LIMITED and SIR KEN STEVENS, KNZM,     )
    )
    )
          Plaintiffs,     )
        v.     )  C.A. No. 12220-VCL
    )
BEUMER CORPORATION, GLIDEPATH     )
LLC, THOMAS DALSTEIN, and FIN     )
PEDERSEN,     )
    )
          Defendants.     )

## MEMORANDUM OPINION

Date Submitted: March 27, 2018
Date Decided: June 4, 2018

Francis G.X. Pileggi, Gary W. Lipkin, Alexandra D. Rogin, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Wilmington, Delaware; *Attorneys for Plaintiffs*.

Benjamin A. Smyth, McCARTER & ENGLISH, LLP, Wilmington, Delaware; William D. Wallach, McCARTER & ENGLISH, LLP, Newark, New Jersey; *Attorneys for Defendants*.

**LASTER, V.C.**

In January 2014, Glidepath Ltd. ("Parent") and Sir Ken Stevens, KNZM, sold 60% of the equity in Glidepath LLC (the "Company") to Beumer Corp. This decision refers to Parent and Stevens as the "Sellers" and to Beumer Corp. as the "Buyer."

The transaction was governed by a Membership Interest Acquisition Agreement dated January 16, 2014, and effective as of January 1, 2014 (the "Acquisition Agreement"). The Acquisition Agreement contemplated a period of shared management, albeit with the Buyer in control, that lasted until March 31, 2016. At that point, the Buyer could exercise an option to call the Sellers' remaining 40% interest in the Company, or the Sellers could exercise a reciprocal option to put their remaining interest to the Buyer. The parties negotiated an Amended and Restated Operating Agreement (the "Operating Agreement") to govern the business and affairs of the Company after closing, during the period of shared management.

Part of the consideration for the 60% interest consisted of an earn-out payment. The Acquisition Agreement contemplated that the period for calculating the earn-out payment would begin on April 1, 2013, and end on March 31, 2016. As noted, the put-call mechanism also keyed off March 31, 2016. Another provision called for the Sellers to receive a distribution equal to 40% of the profits that the Company generated during the earn-out period. That provision also focused on March 31, 2016.

When the parties first negotiated the Acquisition Agreement and the Operating Agreement, they anticipated that the sale of 60% of the equity would close on April 1, 2013, and that the period for calculating the earn-out payment would correspond with the period of shared control. The Buyer, however, sought to postpone closing for legitimate

1

business reasons. The Sellers did not object, and the transaction ultimately closed in January 2014. The parties did not revise the Acquisition Agreement or the Operating Agreement to adjust the earn-out period or the other provisions that focused on March 31, 2016.

The Company failed to perform as anticipated, and the parties' relationship soured. The Buyer told the Sellers that they would not receive any earn-out payment, using the measurement period set out in the Acquisition Agreement. The Sellers disputed the measurement period, asserting that the parties contemplated that the earn-out would begin at closing and last a full three years after closing. The Buyer stood on the language of the Acquisition Agreement.

The parties have raised a variety of claims and defenses. The Sellers' main theories sound in breach of contract, but they also assert claims for breach of fiduciary duty. One of the Sellers' central assertions is that the Acquisition Agreement and the Operating Agreement should be reformed to reflect a full three-year period of shared ownership and management. The resulting decree of reformation would recast each of the provisions that focused on either April 1, 2013, or March 31, 2016, by replacing those dates with January 1, 2014, and December 31, 2016. These revisions would change the period during which the earn-out payment would be calculated. They also would change the date when the Buyer could exercise its call option and acquire the balance of the Sellers' shares, which in turn would affect the period of time during which the Sellers could assert claims for breach of fiduciary duty. Because the success or failure of the reformation claim would

2

affect the analysis of the parties' other claims and the calculation of damages, I directed the parties after trial to brief the reformation claim first.

The Sellers had the burden of proving their reformation claim by clear and convincing evidence. Although there was some evidence to support their position, they failed to carry their burden of proof regarding either (i) the existence of a mutual mistake of fact during the negotiations that resulted in an erroneously drafted agreement or (ii) a unilateral mistake of fact by the Sellers during the negotiations, coupled with knowing silence on the part of the Buyer.

The evidence instead reflected that the Buyer's principals subjectively believed that the earn-out period would start to run on April 1, 2013, regardless of the fact that the transaction did not close until January 2014. The Buyer's parent company previously had completed an acquisition in which a delay pushed the closing into the earn-out period. They had used that deal as a precedent when drafting the Acquisition Agreement, and they saw no reason why the same result would not apply. The Buyer's principals realized in April 2015, long after the negotiations were complete, that the Sellers had a different belief about the timing of the earn-out period.

Judgment is entered in favor of the Buyer on the Sellers' claim for reformation. The provisions in the governing agreements that focused on April 1, 2013, and March 31, 2016, shall continue to focus on those dates. The period of shared ownership and management thus ran from January 1, 2014, until April 1, 2016, when the Buyer exercised its call right. The earn-out period ran from March 31, 2013, until March 31, 2016.

# I. FACTUAL BACKGROUND

Trial took place over four days. The parties submitted 354 exhibits and lodged eighteen depositions. Ten witnesses testified live. The parties proved the following facts.

## A. The Makings Of A Business Deal

The parties to this case and their affiliates are engaged in the business of designing, installing, and maintaining baggage handling systems for airports.[1] At the risk of over simplification, baggage-handling systems come in two types: traditional systems and next-generation systems.[2] The handling systems can also differ in the measurement standard they utilize. The United States persists in using inches, feet, ounces, pounds, and other measures inherited from the British Empire, which consequently are called "Imperial measurements." The rest of the world uses the metric system.[3]

During the period relevant to the parties' dispute, the market in the United States remained dominated by traditional systems using Imperial measurements. The United States had been slow to embrace next-generation systems, which have a higher upfront cost. American customers also continued to harbor skepticism about the reliability of next-

---

[1] *See* Stevens Tr. 7-8; *accord* JX 11 at 8. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX __ at __" refer to trial exhibits using the JX-based page numbers generated for trial.

[2] *See* Stevens Tr. 19-20, 30-31. The distinctions between the two types of system are not pertinent to this phase of the case.

[3] *See, e.g.*, Barr Tr. 563-66; Beumer Dep. 32, 41-43; Pedersen Dep. 13-14.

generation systems, recalling the problems that Denver International Airport encountered when it attempted to implement one.[4]

Non-party BEUMER Group GmbH & Co. KG (the "Beumer Group") is an international industrial conglomerate headquartered in Germany. Among other lines of business, the Beumer Group designs, installs, and maintains airport baggage handling systems at airports around the world. The Beumer Group conducted its operations in the United States through the Buyer.

The Beumer Group and the Buyer were market leaders in next-generation systems, but the Beumer Group had enjoyed its principal success outside of the United States. The Buyer had limited experience with contracting in the United States and even less experience with traditional baggage handling systems utilizing Imperial measurements. As a result, the Buyer was having difficulty penetrating the American market.[5]

Parent also designs, installs, and maintains airport baggage handling systems at airports around the world. Parent conducted its operations in the United States through the Company. Unlike the Beumer Group and the Buyer, the Company had established itself as a significant player in the United States, and it was skilled in producing traditional systems that used Imperial measurements.[6]

---

[4] *See* JX 4 at 6; Stevens Tr. 47.

[5] Stevens Tr. 19-20; *see also* JX 4 at 6.

[6] *See* JX 11 at 12.

But the Company had a problem of its own: it had been struggling because of its limited bonding capacity.[7] In the United States, airports typically are owned by governments or quasi-government entities, and agreements with these entities are subject to government contracting requirements. To secure a job installing or maintaining a baggage-handling system, the contractor typically must supply a performance bond. The contractor's financial strength affects whether it can secure a performance bond and on what terms. Parent and the Company did not have the financial strength required to secure significant bonding capacity. Because of its lack of bonding capacity, the Company had been unable to win jobs. As a result, the Company suffered a net loss of approximately $4 million in the fiscal year that ended on March 31, 2012.[8]

In summer 2012, the Buyer approached the Sellers about acquiring the Company. The Buyer believed that the acquisition would enable the Beumer Group to expand its American footprint.[9] Both sides believed that the Beumer Group's financial strength would satisfy the need for bonding capacity and enable the Company to win jobs.

---

[7] *See* Stevens Tr. 14-15 (referring to bonding as "one of the big issues" and lamenting that the Company had historically "[f]ailed to realize the importance of securing the commensurate amount of bonding and the style of bonding that is unique to the U.S."); *see also* Bryan Tr. 606 (agreeing that prior to the transaction the Company "didn't have a lot of access to bonding").

[8] *See* Barr Tr. 562-63; Hufnagel Tr. 768-69.

[9] *See* Stevens Tr. 13, 64; Barr Tr. 563; *see also* JX 4 at 9; Barr Tr. 566-67; Pedersen Tr. 887-88.

Defendant Thomas Dalstein, who served as the Buyer's President and CEO during the relevant period, led the discussions on its behalf. Stevens led the discussions for the Sellers and the Company. Wayne Collins, a member of Parent's board of directors, assisted Stevens.

**B.     The Term Sheet**

The parties reached an agreement in principle, memorialized in a term sheet that Dalstein sent to Stevens and Collins on January 11, 2013.[10] The term sheet called for the Buyer to acquire 100% of the Company's equity for "aggregate, maximum consideration" of $6 million.[11] The term sheet divided the total possible consideration into four different components.

The Buyer would pay the first two components in return for 60% of the Company's equity.[12] The most straightforward component was a "Fixed Purchase Price" of $1 million in cash, paid at closing.[13] The second component was an earn-out payment of up to $1.56 million (the "Earn Out") based on the Company's performance during "fiscal years 2014, 2015 and 2016" (the "Earn Out Period").[14] If the Company's aggregate net profit during the Earn Out Period reached $2.6 million or more, then the Sellers would receive the

---

[10] JX 12.

[11] *Id.* at 3.

[12] *Id.*

[13] *Id.* at 3, 5.

[14] *Id.* at 4.

maximum Earn Out of $1.56 million. Otherwise, the Sellers would receive a sum equal to "the actual, aggregate net profit over the Earn Out Period multiplied by 0.6."[15] Put more simply, the Earn Out contemplated that the Buyer would pay the Sellers an amount equal to 60% of the net profits generated by the Company during the Earn Out Period, up to a maximum $1.56 million.

The third component of consideration was a distribution equal to 40% of the net profit generated by the Company during the Earn Out Period, up to a maximum of $1.04 million.[16] The Earn Out and the distribution worked together to give the Sellers the benefit of all of the net profit generated by the Company during the Earn Out Period.

The fourth and final component was a payment of up to $2.4 million in return for the remaining 40% of the Company's equity. The purchase would take place pursuant to a put-call mechanism generally exercisable beginning on March 31, 2016 (the "Put-Call Mechanism").[17] The maximum consideration of $2.4 million consisted of a fixed payment of $400,000 plus a variable portion of up to $2 million. If the Company's aggregate net profit during the Earn Out Period equaled or exceeded $2.6 million, then the Sellers would

---

[15] *Id.*

[16] *Id.* at 3. The term sheet omitted the percentage amount. The Acquisition Agreement reflected the 40% figure. *See* JX 61 § 3.4.1.

[17] The term sheet provided for triggers that would permit an earlier exercise, as well as a pricing mechanism for calculating the payment if the option were exercised before March 31, 2016, but those aspects are not relevant to this decision. *See* JX 12 at 10-11.

receive the maximum. If the net profit was less, then the variable element would "be reduced proportionately."[18]

## C.     The Parties Miss Their Target Closing.

The parties hoped to close immediately after the completion of the Company's 2013 fiscal year, which ended on March 31, 2013.[19] With that goal in mind, they moved quickly to negotiate binding transaction documents after agreeing on the term sheet.[20]

In a decision that would redound profoundly to their detriment, the Sellers did not formally involve outside counsel and did not retain counsel in the United States.[21] Stevens testified that he consulted at times with a New Zealand solicitor, but the solicitor did not play a meaningful role in the negotiations.[22] In substance, Stevens and Collins attempted to handle everything themselves, including both the business negotiations and the documentation of the transaction.

The Buyer took a different approach. Dalstein continued to lead the business negotiations, now with the assistance of Norbert Hufnagel, the Beumer Group's CFO. The

---

[18] JX 12 at 10.

[19] *See* JX 12 at 3 (listing the "Effective Date" as "preferably effective on April 1, 2013, immediately following close of current fiscal year of [the Company]"); Stevens Tr. 20; Barr Tr. 570.

[20] *See* JX 14 at 2-3 (email exchanges negotiating provisions and memorializing the Buyer's intention "to have the first drafts of the various agreements to you [the Sellers] around the 12th feb").

[21] *See* Stevens Tr. 119-20; Collins Tr. 221; Hufnagel Tr. 805.

[22] Stevens Tr. 119.

9

Buyer also retained outside counsel, who took primary responsibility for drafting the transaction documents and responding to the Sellers' comments.[23]

The Buyer's outside counsel modeled the transaction documents on the Buyer's recent acquisition of Indec Airport Automation BVBA, a Belgian company.[24] The Indec acquisition closed at the end of 2012. The transaction documents contemplated an upfront payment plus an earn-out payment. The earn-out was calculated based on a period intended initially to begin immediately after closing. But after intellectual property issues delayed the closing, the parties left the dates for the earn-out period unchanged. The result was that the earn-out period in the Indec transaction commenced prior to closing. Although the Indec transaction will not result in an earn-out payment, the timing of the earn-out period has not generated any disputes.[25]

Starting from the Indec precedent, the Buyer's counsel circulated several iterations of the agreements.[26] During this period, the parties also discussed whether to change the

---

[23] *See* JX 351 (draft agreements received from the Beumer Group's German counsel).

[24] Collins Tr. 242; Barr Tr. 573-74; Hufnagel Tr. 759-60; *see also* JX 3 (Share Sale and Purchase Agreement governing Indec acquisition); JX 50 at 4 (email from Stevens to accountant venting "we are being manipulated through/over a very poor contract (which Thomas [Dalstein] told me was used for acquisition of a Belgium company)").

[25] Hufnagel Tr. 760-65.

[26] *See, e.g.*, JX 19-20.

Company's accounting from a fiscal year to a standard calendar year, which would conform to the Beumer Group's accounting practices.[27]

By the end of March 2013, the documents were substantially complete.[28] At this point, the Beumer Group delayed closing. The Beumer Group wanted the Buyer to fund the $1 million due at closing out of cash on hand, which the Buyer was not in a position to do. The Beumer Group also wanted to find a suitable CEO to operate the Company before closing the transaction and taking over operations.[29] Stevens and Collins accepted the Beumer Group's reasons for delay.[30]

In June 2013, the Buyer's accountants reviewed and commented on the Acquisition Agreement. They noted that it "refer[s] to fiscal years here but I believe the intent [is] to change the [Company] to a 12/31 year end."[31] Despite this comment, the parties never changed the dates in the draft agreements.[32]

---

[27] *See* JX 16 at 2; *see also* Barr Tr. 665 (agreeing the Beumer Group operates on a calendar year).

[28] *See* JX 19 at 2 (email from Collins providing two discreet comments and concluding "[o]therwise, everything is fine"); Stevens Tr. 125.

[29] Hufnagel Tr. 765-66; *see also* Hufnagel Dep. 105-09.

[30] *See* Stevens Tr. 122-25.

[31] JX 28 at 2.

[32] Hufnagel Tr. 818.

11

**D.     The Transaction Closes.**

By November 2013, the Buyer had secured the necessary financing to fund the transaction. The Buyer also had identified defendant Finn Pedersen as the CEO who would run the Company after closing.[33]

With these goals achieved, the parties targeted a closing in January 2014.[34] They again reviewed the documents and reopened and renegotiated several final points. On December 3, 2013, Collins sent a detailed issues list identifying a number of objections by clause number. Included in that list was a "suggestion" that "we make the Earn Out as being paid out of the Company so we can shield it from tax and you don't have liability for tax on it."[35] Despite focusing on the Earn Out, Collins did not make any comments about the dates for the Earn Out Period.

The Buyer's CFO, Christopher Bryan, also reviewed the agreements. He focused on the "Purchase Price" and "Call and Put Option" sections.[36] He likewise did not make any comments about the dates. Bryan understood the possibility of using calendar year dates. While securing financing from Bank of America, he told the bank that the transaction was "expected to close in November with a 'cash at closing' from [the Buyer] of $1.0 million and an earnout over the next three years based on EBIT with total consideration, including

---

[33] *See* JX 37 at 2.

[34] *See* JX 39 at 2.

[35] JX 40 at 3.

[36] JX 47 at 2.

cash at closing, not to exceed $6.0 million."[37] At trial, Bryan agreed that his statement to the bank implied an earn-out period that would run for three full years after closing.[38] To reiterate, Bryan did not suggest changing any of the dates in the agreements.

By January 7, 2014, the documents were substantially complete. Collins reviewed them again and identified "only two issues, the Cash at Closing and the new indemnity on tax."[39] On January 10, Collins sent Stevens signature pages to be signed and held in escrow pending closing.[40] When the Buyer's counsel continued to make minor comments on the agreements, Collins admonished that he did not "want any more copies of the documents until you can assure me that your client is finished making changes or requires no further information."[41] He then emailed Dalstein and Hufnagel, telling them: "Enough is enough, we have our commercial agreement based on the mutual trust between us, let's get on with it."[42]

On January 16, 2014, Collins agreed to release the signature pages from escrow, and the transaction closed.[43] Neither Stevens nor Collins reviewed the documents a final time

---

[37] JX 36 at 2.

[38] Bryan Tr. 599.

[39] JX 48 at 2.

[40] JX 52 at 2.

[41] JX 58 at 2.

[42] JX 60 at 2.

[43] JX 62-63.

13

before Collins released the signature pages.[44] Stevens was on vacation and placed his trust in Collins.[45] Collins testified at trial that he "overlooked the fact that [the Acquisition Agreement] still had the reference to fiscal year when I thought it was going to be a calendar year."[46]

### E.    The Operative Terms Of The Agreements

The executed Acquisition Agreement contained the following provision summarizing the consideration that the Sellers would receive:

> 3.1.1   The aggregate purchase price (the "***Purchase Price***") payable by the Purchaser to the Seller in respect of the Purchased Membership Interest shall consist of:
>
> > (i)      the Cash at Closing and payments, if any;
> >
> > (ii)     the Earn Out; and
> >
> > (iii)    the Profit Distribution.[47]

The executed Acquisition Agreement defined "Cash at Closing" as "One Million Dollars," plus (i) "a further payment of $500,000, provided that [the] Company's bank balance is $500,000 or greater on March 31, 2014," and (ii) "a further payment in the amount equal

---

[44] Stevens Tr. 28-29; Collins Tr. 221-23, 261.

[45] Stevens Tr. 29-30.

[46] Collins Tr. 261; *accord id.* at 263.

[47] JX 61 § 3.1.1.

14

to the Company's bank balance at June 30, 2014, not to exceed $1,000,000, less [the $500,000 payment, if previously made]."[48]

The executed Acquisition Agreement described the Earn Out as follows:

3.2.1   The Purchaser shall pay to the Seller a further amount (the "***Earn Out***") in an amount determined as follows:

(i)      If the cumulated, aggregate Net Profit of the Company in its fiscal years 2014, 2015 and 2016 (collectively, the "***Earn Out Period***") is greater than or equal to Two Million Six Hundred Thousand and No/100 Dollars (US$2,600,000.00), then the Earn Out shall equal One Million Five Hundred Sixty Thousand and No/100 Dollars (US$1,560,000.00); and

(ii)     If the cumulated, aggregate Net profit of the Company in the Earn Out Period is less than Two Million Six Hundred Thousand and No/100 Dollars (US$2,600,000.00), then the amount of the Earn Out shall be equal to sixty percent (60%) of the Net Profit for the Earn Out Period.

3.2.2   The Company's Net Profit shall be calculated on the basis of the respective Final Audited Annual Accounts for the respective fiscal year.[49]

The Earn Out Period was thus defined in terms of the Company's "fiscal years 2014, 2015, and 2016." In substance, the two-part equation called for an earn-out payment equal to 60% of the Net Profit during the Earn Out Period, capped at $1,560,000.

The executed Acquisition Agreement also described the Profit Distribution. It stated:

3.4.1   Within ten (10) Business Days following agreement by the Purchaser and the Seller on the Final Audited Annual Accounts for the Company's fiscal year 2016 in accordance with Section 11.1 of the Operating Agreement, the Parties shall cause the Company to distribute to the Seller out of funds legally available therefor an amount equal to the product

---

[48] *Id.* §§ 3.1.2-3.1.4.

[49] *Id.* §§ 3.2.1-3.2.2.

obtained when the cumulative, aggregate Net Profit of the Company during the Earn Out Period, is <u>multiplied by</u> 0.40 (the "***Profit Distribution***"); such Profit Distribution shall be capped at and shall not exceed One Million Forty Thousand and No/100 Dollars (US$1,040,000.00), and to the extent there is a loss carry forward (the "***NOL Amount***") of the Company on the Closing Date that would otherwise preclude the Company from effecting the full amount of the Profit Distribution otherwise payable, the Purchaser shall pay to the Seller at a mutually agreeable time an amount up to the NOL Amount in place of the Profit Distribution of equal amount by the Company to the Seller . . . .[50]

The combination of the Profit Distribution and the Earn Out Period operated to entitle the Sellers to an amount equal to the Company's net profit during the Earn Out Period, capped at $2.6 million, with the 60% from the Earn Out coming from the Buyer and the 40% from the Profit Distribution coming from the Company.

Finally, the executed Operating Agreement contained provisions governing the Put-Call Mechanism. The reciprocal options would become generally exercisable after March 31, 2016, and would result in the Buyer acquiring the remaining 40% of the equity in the Company in return for

an amount equal to the <u>sum</u> of Four Hundred Thousand and No/100 Dollars ($400,000.00) <u>plus</u> a variable component of either (x) Two Million and No/100 Dollars ($2,000,000.00) (the "**Maximum Amount**"), if the cumulated, aggregate Net Profit of the Company in the Earn Out Period (as such term is defined in the Membership Interest Acquisition Agreement) is greater than or equal to Two Million Six Hundred Thousand and No/100 Dollars ($2,600,000), or if not, <u>then</u> (y) an amount equal to the <u>product</u> obtained when the Maximum Amount is <u>multiplied by</u> the fraction obtained when the cumulative, aggregate Net Profit of the Company during the Earn

---

[50] *Id.* § 3.4.1.

Out Period is divided by Two Million Six Hundred Thousand and No/100 Dollars ($2,600,000.00) . . . .[51]

In the aggregate, the consideration received by the Sellers from the Cash at Closing, the Earn Out, the Profit Distribution, and the Put-Call Mechanism could not exceed $6 million.[52]

### F.     The Sellers Learn That An Earn Out Payment Is Unlikely.

During the first three quarters after the acquisition, the Company struggled. By November 2014, the Buyer and Company management had determined that the Company was unlikely to produce a "cumulated, aggregate Net Profit" during the Earn Out Period. As a result, the Earn Out would not yield any additional consideration for the Sellers.[53]

A regular meeting of the Company's members was scheduled for November 19, 2014. The Buyer and Company management decided that they needed to inform the Sellers about the Company's performance and its effect on the Earn Out. Pedersen prepared a presentation that explained "the earn out, the situation and the different scenarios."[54] Commenting on the slides, Bryan emphasized the need for a slide that depicted an "earn-out scenario" that "begins at 4/1/2013 and ends on 3/31/2016."[55] The next draft

---

[51] JX 65 § 8.3.3.

[52] JX 61 § 3.4.3.

[53] Hufnagel Tr. 830-31 (testifying that he "could see very quickly sort of that the earnout is virtually impossible to achieve"); *accord id.* at 839-40.

[54] JX 226 at 2.

[55] *Id.*; *see also* Bryan Tr. 604-05.

demonstrated progress towards the Earn Out (or lack thereof) as measured by fiscal years ending March 31.[56] Anticipating that the presentation would not be well received, the Buyer had outside counsel review the deck.[57]

The meeting convened as scheduled. The presentation showed that the Company had incurred a net operating loss of $1.56 million for the fiscal year that ended on March 31, 2014.[58] It forecasted continuing losses for the fiscal year ending March 31, 2015. The presentation forecasted modest gains in 2016, but projected they would be inadequate to generate a cumulative net profit since the closing of the acquisition.[59]

The November 2014 meeting was the first time the Sellers learned that they were unlikely to receive any consideration from the Earn Out. Stevens was "shocked"[60] and his demeanor was "icy."[61] But he did not raise any objections to the analysis.[62]

## G.      The Sellers Raise Questions About The Earn Out.

Despite the grim news from the November 2014 meeting, Stevens did not follow up about the Earn Out until four months later. On March 10, 2015, he asked for a meeting

---

[56] *See* JX 234 at 14.

[57] *See* JX 238 at 2; JX 241 at 2.

[58] JX 239 at 33.

[59] *Id.*

[60] Hufnagel Tr. 845-46.

[61] *Id.* at 833.

[62] *Id.* at 833-40.

18

with Christoph Beumer, the Chairman of the Beumer Group. In his email, Stevens emphasized that "I need us both to achieve the earn out. I relied heavily on the strength and reputation of Beumer Corporation to pull this through. Maybe this will be a better year—I certainly hope so."[63]

Beumer did not share Stevens' optimism. He responded that

the numbers in 2014 are very bad and in all fairness, [the Company] was definitely not in the shape Wayne [Collins] always communicated and made us [] believe. The earn out based on the 2014 numbers will not be achievable anymore as planned. I fully understand that this is more than difficult and a serious situation for you but the p[l]anning was based on figures which just did not materialize. Therefore we need to talk. So I really would appreciate to get your view prior to the board meeting before we meet. This will give me the opportunity to talk also to my colleagues and [develop] a fair solution to all parties based on facts. I definitely want to find a fair solution but we both also have to acknowledge that the numbers turned out to be different at the end as we all wanted them to be.[64]

Beumer's response infuriated Stevens. He shot back that the November 2014 presentation had been a "rambling mess" and he lamented that "[w]e appear to have gone side-ways for 5 months."[65] Stevens argued that he turned over the Company in strong financial condition and that the Beumer Group necessarily understood the Company's financial position after conducting extensive due diligence.[66] He derided Beumer's

---

[63] JX 268 at 3.

[64] JX 280 at 8-9.

[65] JX 279 at 9.

[66] *See id.* at 10 ("In any case . . . you are running an international company having acquired several companies, you had [the Company] under scrutiny for 16 months while due diligence went on.").

statements about Collins as "serious and libelous."[67] Stevens concluded his email by expressing a desire to "settle our affairs amicably."[68]

Several heated emails followed before Stevens and Beumer agreed it was best to meet in person.[69] In advance of that meeting, Dalstein suggested in an email to Hufnagel and Beumer on April 24, 2015, that Stevens and Collins did not appear to understand how the Earn Out worked. Dalstein observed that "Wayne [Collins] still has not recognized that the last year was the second year of the earnout."[70] At trial, Dalstein agreed that he believed as of April 2015 that Stevens and Collins were under a "misimpression" about the structure of the Earn Out.[71] Dalstein explained that based on the statements that Stevens and Collins were making, he thought that they still were not aware of the timing of the Earn Out Period, notwithstanding the language of the Acquisition Agreement and the dates in the November 2014 presentation.[72] Collins, by contrast, testified at trial that he became aware of the disagreement over how the Earn Out operated during the November 2014 meeting.[73]

---

[67] *Id.*

[68] *Id.* at 11.

[69] JX 280 at 2-3.

[70] Dalstein Tr. 1039 (roughly translating a German email at JX 279 at 2); *see also* Beumer Dep. 124-27.

[71] Dalstein Tr. 1039.

[72] *Id.* at 1040.

[73] Collins Tr. 227.

## H.  The Sellers Realize Their Mistake.

The parties met in Dallas on April 29, 2015.[74] The meeting was short and unsuccessful. Stevens characterized the Buyer's representatives as "rather belligerent" and "overly forthright."[75] Beumer took the position that "he had paid too much for" the Company and "wasn't prepared to pay another penny for it."[76]

During the meeting, the Buyer's representatives made clear that they believed that the Earn Out had started on April 1, 2013, and ran through March 31, 2016.[77] In the aftermath of the meeting, Stevens was "angry," "very unhappy and not satisfied."[78]

After a subsequent conversation with Stevens, Pedersen reported back to Dalstein that Stevens "really feels that the company is being 'stolen from him.'"[79] Pedersen also explained that Stevens was "clearly surprised and upset about the start of [the] 'earn out' in April 2013."[80]

---

[74] Dalstein Tr. 1120.

[75] Stevens Tr. 38.

[76] *Id.*; *see also* Beumer Dep. 141-43.

[77] *See* JX 286 at 2; *see also* Stevens Tr. 36-40; Dalstein Tr. 1120-21; Beumer Dep. 141-43.

[78] JX 286 at 2.

[79] *Id.*

[80] *Id.*

21

## I.     This Litigation

On September 18, 2015, the Sellers commenced an arbitration against the Buyer. On April 1, 2016, while the arbitration remained pending, the Buyer exercised its call option.

The parties subsequently agreed to abandon arbitration in favor of litigating in this forum.[81] On April 15, 2016, the Sellers contemporaneously filed the complaint in this action and a motion seeking a temporary restraining order enjoining the exercise of the call. On April 22, I denied the motion.[82]

On November 1, 2017, the Sellers filed an amended complaint. It asserted claims for breach of the Acquisition Agreement, breach of the Operating Agreement, and breach of the implied covenant of good faith and fair dealing against the Buyer. It also asserted claims for breach of fiduciary duty and civil conspiracy against Dalstein and Pedersen. The complaint also sought reformation.

On November 8, 2017, the Sellers moved for summary judgment on certain of their claims. By order dated January 5, 2018, I granted the motion as to isolated claims for breach of contract.[83]

Trial took place from January 8-11, 2018. After trial, I directed that the parties present the reformation issue first, because the success or failure of that claim would

---

[81] *See* Dkt. 2 at 2 n.2.

[82] *See* Dkt. 18 at 43-54.

[83] Dkt. 147.

22

establish the relevant time periods for the parties' other claims and for the calculation of damages.

## II.  LEGAL ANALYSIS

This decision only addresses the Sellers' claim for reformation. The Sellers seek a decree of reformation that would alter the Earn Out Period, the Profit Distribution, and the Put-Call Mechanism. In each case, the decree would cause the operative dates in the provisions to be measured using a calendar year, rather than a fiscal year ending March 31.

 "Reformation is an equitable remedy which emanates from the maxim that equity treats that as done which ought to have been done."[84]

> Courts employ the reformation remedy when parties enter into an agreement or transaction but, because of fraud or mutual mistake, the contract or instrument reflecting such agreement or transaction does not express the actual intention of the parties. In that instance, a court of equity may order the instrument reformed so it represents the agreement or transaction actually intended.[85]

The party seeking reformation first must show that it was mistaken about the contents of the final, written agreement. The proponent next must show either that its counterparty was similarly mistaken (mutual mistake) or that its counterparty "knew of . . . [the] mistake and remained silent" so as to take advantage of the error.[86] Finally, the party seeking

---

[84] *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *13 (Del. Ch. Oct. 20, 2015) (internal quotation marks omitted) (quoting *Interim Healthcare, Inc. v. Sherion Corp.*, 2003 WL 22902879, at *6 (Del. Ch. Nov. 19, 2003)).

[85] Donald J. Wolfe, Jr. & Michael A. Pittinger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.05 (2017).

[86] *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1152 (Del. 2002).

reformation must prove the existence of a specific meeting of the minds regarding a term that was not accurately reflected in the final, written agreement.[87]

The party seeking reformation "must prove each of the required elements by clear and convincing evidence."[88] This is "an intermediate evidentiary standard, higher than mere preponderance, but lower than proof beyond a reasonable doubt."[89] It "requires evidence that 'produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions [is] highly probable.'"[90] "To establish proof by clear and convincing evidence means to prove something that is highly probable, reasonably certain, and free from serious doubt."[91] Imposing this heightened burden for a claim for reformation

---

[87] *See Cerberus*, 794 A.2d at 1152 (holding that, to prevail on its claim for reformation, the plaintiff "must show that: (i) MTI thought that the merger agreement gave MTI's stockholders the proceeds of the options and warrants; (ii) either that Apollo was also similarly mistaken, or that Apollo knew of MTI's mistake and remained silent; and (iii) that MTI and Apollo had specifically agreed that the proceeds of the options and warrants would to go MTI's stockholders"); *cf. Envo, Inc. v. Walters*, 2009 WL 5173807, at *4 (Del. Ch. Dec. 30, 2009); *Joyce v. RCN Corp.*, 2003 WL 21517864, at *4 (Del. Ch. July 1, 2003).

[88] *Cerberus*, 794 A.2d at 1152.

[89] *Id.* at 1151 (internal quotation marks omitted) (quoting *In re Travel*, 661 A.2d 1061, 1070 n.5 (Del. 1995)).

[90] *Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002) (quoting *Cerberus*, 794 A.2d at 1151).

[91] *Id.* at 147 (internal quotation marks omitted) (quoting Del. Super. P.J.I. § 4.3 (2000)).

"preserve[s] the integrity of written agreements by making it difficult to modify executed contracts."[92]

## A.      Mutual Mistake

To prove mutual mistake, "the plaintiff must show that both parties were mistaken as to a material portion of the written agreement."[93] The evidence established that the Sellers mistakenly believed that the Acquisition Agreement and Operating Agreement would use calendar years to measure the Earn Out Period, the Profit Distribution, and the Put-Call Mechanism. But the Sellers did not prove by clear and convincing evidence that the Buyer was similarly mistaken.

During the discussions over the term sheet, the parties shared an understanding that the Earn Out Period would consist of three complete fiscal years beginning on April 1, 2013. The term sheet memorialized that understanding.[94] Stevens and Collins testified to this fact, and Hufnagel candidly acknowledged it.[95] The defendants do not dispute it.

---

[92] *TIBCO*, 2015 WL 6155894, at *13 (internal quotation marks omitted) (quoting *Joyce*, 2003 WL 21517864, at *3).

[93] *Cerberus*, 794 A.2d at 1151.

[94] JX 12 at 3.

[95] *See* Stevens Tr. 76-77 (confirming "the original plan for the length of the earnout period" was "[t]hree full years starting on April 1, 2013"); Collins Tr. 227 (testifying the Earn Out Period "should have been three years from closing"); Hufnagel Tr. 762 ("It was not the intention to start, basically, the earnout before closing."); *id.* at 766 (confirming "the earnout period would have been a full three years post-closing" if "the closing occurred on schedule in April 2013").

That shared understanding did not extend to what would happen if the transaction failed to close on April 1, 2013, as the parties had anticipated. Stevens and Collins testified to their belief that the dates would be updated to run for three years after the date of closing.[96] There is reason to question that testimony, because Stevens and Collins did not attempt to update the dates in the transaction documents when the deal failed to close by April 1, 2013. Collins made comments that related to the Earn Out,[97] yet on final review, Collins had "only two issues, the Cash at Closing and the new indemnity on tax."[98] Stevens provided Collins with executed signature pages without reviewing the final documents.[99] Regardless, this decision accepts for purposes of analysis that Stevens and Collins believed contemporaneously that the Earn Out Period would run for three years after closing and that calendar year dates would be used for the other provisions in the contracts.

The Buyer's representatives testified credibly at trial that they had a different understanding. They thought that they had agreed to a specific Earn Out Period that began on April 1, 2013, and ended on March 31, 2016. They also thought that they had agreed to specific dates for the Profit Distribution and the Put-Call Mechanism. They saw no need to change any of the dates. Hufnagel explained at trial that his only prior experience with an

---

[96] *See* Stevens Tr. 22, 43, 66, 76-77, 79; Collins Tr. 226-27.

[97] JX 40 at 3.

[98] JX 48 at 2.

[99] Stevens Tr. 28-29.

earn-out was the Indec transaction.[100] The negotiations there proceeded similarly: the parties finalized the agreements months before the closing with an agreed-upon earn-out period, and even though the closing was delayed, no one updated the dates. The result was that the Indec earn-out began to run prior to closing.[101] Hufnagel testified credibly that he believed that the Company's earn-out would work the same way.[102] Tony Barr, who had served as the Buyer's Chief Marketing Officer and Vice President of Corporate Development during the relevant period, testified credibly to the same effect.[103]

To impeach this testimony, the Sellers relied on other documents suggesting that after the acquisition closed, the Buyer caused the Company to change from operating on a fiscal year to operating on a calendar year, as the Beumer Group did.[104] There is some documentation indicating that the Buyer anticipated converting the Company to a calendar year.[105] For example, the Beumer Group had audited financial statements prepared for the Company on a calendar-year basis so that they could be consolidated with the Beumer Group's financial statements.[106] The Beumer Group also prepared budgets and projections

---

[100] Hufnagel Tr. 762-66.

[101] *Id.* at 760-65.

[102] *Id.* at 766.

[103] Barr Tr. 573.

[104] *See id.* at 665; Pedersen Tr. 871.

[105] *See* JX 16; JX 28 at 2; JX 47 at 2; JX 80.

[106] Perez Dep. 15-17.

27

for the Company on a calendar year basis.[107] But the Beumer Group took steps to prepare additional financial statements for the stub period from January 1 to March 31 of each year. These statements were not independently audited; they were only reviewed. They were, however, based on the Company's audited financial statements.[108] Bryan, the Buyer's CFO, testified that Company management had not, in fact, changed the Company's fiscal year.[109] The evidence regarding a change in the Company's fiscal year is not sufficient to call into question the testimony of the Buyer's representatives regarding their belief about the dates in the operative agreements.

The Sellers also argue strenuously that having an earn-out period start before closing makes no sense, and their expert testified that he had never seen that before.[110] I have not seen that either, and until trial, I remained deeply skeptical about the Buyer's position. As the Sellers' expert explained, an earn out typically operates to compensate the sellers for the performance of an asset during a period of time when the buyer owns the asset and otherwise receives the benefits of ownership.[111] By starting the Earn Out before closing,

---

[107] *See* JX 117 at 26; Hufnagel Tr. 775-76.

[108] *See, e.g.*, JX 127; JX 266; JX 334.

[109] Bryan Tr. 631; *see also id.* at 590-94.

[110] Cowhey Tr. 490.

[111] *Id.* at 408-09.

the seller gets the benefit of the asset's performance during that period, then gets the benefit of that period again if the earn-out is paid, creating a form of double counting.[112]

Importantly, however, the double-counting risk is a problem for the buyer, not the seller. Hufnagel acknowledged that the Buyer would "have been on the hook . . . if [the Company] knocked it out of the park and made tons of money in between April '13 and December of 2013," even though Company management "could have just awarded themselves massive bonuses."[113] Hufnagel testified credibly that this risk "was not . . . a thought [that he] had."[114] The Buyer's representatives instead assumed that the dates would not change, both because of their experience with Indec and because they had priced and negotiated the deal based on the Company's situation in early 2013. From their standpoint, it would have been necessary to re-negotiate the pricing if the measurement periods changed.[115] I credit that it never occurred to the Buyer's representatives that the dates would be updated.[116]

The Sellers proved that the dates in the Operating Agreement and Acquisition Agreement were odd and cumbersome, and they provided some evidence in support of their position that the agreements should be reformed. But the Sellers did not establish by

---

[112] *See id.*

[113] Hufnagel Tr. 769-70.

[114] *Id.* at 770.

[115] *Id.* at 768.

[116] *See* Barr Tr. 573-74.

clear and convincing evidence that the Buyer's representatives shared the Sellers' mistake. The Buyer's representatives testified credibly that they understood that the dates had not changed and did not think anything of it. The doctrine of mutual mistake therefore does not apply.

**B.      Unilateral Mistake With Knowing Silence**

To obtain reformation based on a unilateral mistake, the party seeking reformation must prove both "that it was mistaken and that the other party knew of the mistake but remained silent."[117] A party who remains silent during the negotiation and documentation of a deal knowing that the other side is mistaken about the agreement's failure to document properly the parties' shared understanding is engaging in sharp practice. "A party should not benefit from a mistake when knowing that the other had made such a mistake."[118]

The Sellers proved that the Buyer and its representatives came to understand that the Sellers had made a mistake, but this happened well after signing. On April 24, 2015, Dalstein emailed Hufnagel and Beumer that Collins "still failed to recognize that last year [was] the second year of the earn out."[119] Dalstein acknowledged at trial that by the date of

---

[117] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 679-80 (Del. 2013) (internal quotation marks omitted) (quoting *Cerberus*, 794 A.2d at 1151).

[118] 27 Richard A. Lord, *Williston on Contracts* § 70:111 (4th ed. 2015); *see also Restatement (Second) of Contracts* § 161(c) (Am. Law Inst. 1981) (stating that non-disclosure is equivalent to assertion "where [a person] knows that disclosure of the fact would correct a mistake of the other party as to the contents or effect of a writing, evidencing or embodying an agreement in whole or in part").

[119] JX 279 at 16.

30

the email he "knew . . . that there was a misimpression between the parties . . . as to the earnout period start date."[120] Beumer similarly acknowledged that as of receipt of the email he was aware of the Sellers' misunderstanding.[121]

The Sellers proved that in April 2015, the Buyer's representatives did not contact the Sellers to correct their misunderstanding. Beumer testified that he did not reach out to the Sellers at this point because their relationship had deteriorated and he felt "mistreated" by Collins.[122] Furthermore, the Buyer's representatives believed that they already had communicated their understanding of how the Earn Out worked during the November 2014 presentation and "many times" afterwards.[123] If the Buyer had understood the nature of the Sellers' mistake at the time of contracting and had remained silent, then the outcome would be different. On the facts presented, the Buyer did not perceive the Sellers' misunderstanding until sometime between the November 2014 and April 2015 meetings. By then, the Buyer gained no advantage by remaining silent. The dispute escalated, and the Sellers commenced a timely arbitration, followed by this litigation.

The Sellers produced some evidence suggesting that the Buyer should have known that the Sellers would not have intended for the Earn Out Period to begin prior to closing.

---

[120] Dalstein Tr. 1039.

[121] Beumer Dep. 126.

[122] *Id.* at 135.

[123] Dalstein Tr. 1041.

The Buyer knew that 2012 had been "uglier than . . . expected" for the Company.[124] The Buyer also knew that the Company needed access to bonding capacity to win bids and that securing access to bonding was one of the Sellers' reasons for engaging in the deal.[125] The Buyer's representatives could have put two and two together and realized that the Sellers would not have agreed to have part of the Earn Out Period run during a time when the Company lacked the financial capacity to secure bids.[126]

Although this evidence supported the Sellers' claims and created issues of fact for trial, the Sellers ultimately failed to demonstrate by clear and convincing evidence that the Buyer knew of the Sellers' mistake at signing and remained silent. Stevens admitted that he thought that the Buyer likely first understood that the Sellers' had a different understanding about the Earn Out Period "prior to the meeting we had in Dallas in April 2015."[127] He later clarified that the Buyer could have known "at mid-year 2014."[128] Even Stevens did not assert that the Buyer understood during the negotiations that the Sellers were mistaken about how the deal documents operated.

---

[124] JX 1 at 2; *see also* Barr Tr. 562-63.

[125] Bryan Tr. 606 (acknowledging the Company "didn't have a lot of access to bonding" and post-transaction "would be relying entirely on [the Buyer's] bonding").

[126] *See id.* (acknowledging "[t]here could have been" a "motivation from [the Buyer] to make sure that the earnout period begins on April 1, 2013, because the [Company] wasn't making money").

[127] Stevens Tr. 98.

[128] *Id.* at 100.

The evidence convinces me that during the negotiation of the definitive agreements, the Buyer's representatives gave little thought to the operation of the Earn Out or the operative dates for the Profit Distribution and the Put-Call Mechanism. They thought they had negotiated the price in the January 2013 term sheet, and they believed that the price terms remained operative. Based on the Indec precedent, they did not see any need to update the dates, and they thought that any change in the dates would have required repricing the deal. Given their beliefs, they had no reason to suspect that the Sellers had a different understanding. The Sellers failed to prove by clear and convincing evidence that the Buyer knew of their mistake at the time of contracting and remained silent.

## C.  No Agreement Regarding Calendar Years

The Sellers' claim for reformation fails for a further reason. "Regardless of which doctrine [mutual or unilateral mistake] is used, the plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement."[129] "Unless there was a clear understanding with which the formal contract conflicts, there is, of course, no comparative standard upon which to base a reformation, and the contract as executed must stand."[130] "This evidence provides a comparative standard that tells the Court of Chancery 'exactly what terms to

---

[129] *Cerberus*, 794 A.2d at 1151-52.

[130] *Hob Tea Room v. Miller*, 89 A.2d 851, 857 (Del. 1952).

insert in the contract rather than being put in the position of creating a contract for the parties.'"[131]

The only written evidence of a prior understanding between the parties is the term sheet. It defines the Earn Out Period as the Company's "fiscal years 2014, 2015 and 2016."[132] At the time, the Company's fiscal year ended on March 31.

As noted, representatives of both sides agreed that the original bargain contemplated that the Earn Out Period would span three full years after closing.[133] But that understanding assumed that the closing occurred shortly after March 31, 2013. There was no meeting of the minds about how the dates would operate if the closing was delayed. The Buyer believed that the dates would remain as negotiated. The Sellers never changed the dates.[134] Only after a dispute arose did the Sellers claim that they thought that the dates would be updated.

Absent evidence that the parties reached a meeting of the minds, there is no prior understanding for the court to enforce. For this additional reason, the reformation claim fails.

---

[131] *Cerberus*, 794 A.2d at 1152 (quoting *Collins v. Burke*, 418 A.2d 999, 1002 (Del. 1980)).

[132] JX 12 at 4.

[133] *See* Stevens Tr. 76-77; Hufnagel Tr. 766.

[134] *See, e.g.*, JX 40; JX 44; JX 47-48; JX 351.

## III.      CONCLUSION

The Sellers failed to prove their claim for reformation. The provisions in the governing agreements that focused on April 1, 2013, and March 31, 2016, shall continue to focus on those dates. The period of shared ownership and management thus ran from January 1, 2014, until April 1, 2016, when the Buyer exercised its call right. The Earn Out Period ran from March 31, 2013, until March 31, 2016.

With the benefit of these dates, the parties shall brief the remaining post-trial issues, including the quantum of damages for the claims addressed on summary judgment. Within ten days, the parties shall submit a stipulated briefing schedule for presenting these issues.